IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIFAH MUSTAPHA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 10 C 5473 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| JONATHON E. MONKEN, PATRICK ) | |
| KEEN, and ILLINOIS STATE POLICE, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

After Kifah Mustapha was terminated as a volunteer chaplain for the Illinois State Police, he filed suit alleging race, religion and national origin discrimination under Title VII, as well as violations of his rights under the First Amendment and the Equal Protection clause. Defendants move for summary judgment as to all claims. For the reasons stated below, the motion is granted.

I.  Facts

Plaintiff is Muslim and of Middle Eastern descent. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 1.) Monken was the Acting Director for the Illinois State Police ("ISP") at all relevant times. (*Id*. ¶ 2.) Keen was the Deputy Director of the Division of Administration for the ISP at all relevant times. (*Id*. ¶ 3.) The ISP operates a statewide Terrorism and Intelligence Center and is a member of the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force. (*Id*. ¶¶ 7, 8.) The ISP also has information sharing agreements with various federal and state law enforcement agencies. (*Id*. ¶ 9.)

Plaintiff has served as an imam at the Mosque Foundation continuously since 2002, performing such activities as prayer, community outreach, counseling and education. (*Id*. ¶ 10.) As reflected in letters of support provided to Defendants in March 2010, many Arab and Muslim organizations view Plaintiff as one of the most influential Islamic leaders in Illinois and a role model to Muslim youth and adults. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 80.) The President of the Arab American Business & Professional Association advised Defendants that Plaintiff's religious sermons demonstrated that he "is a voice of moderation and respect." (*Id*.) Based on the background investigations of chaplains conducted in 2010, Plaintiff was the only chaplain for whom ISP received letters of support from such a large number of organizations. (*Id*.) In 2004, Plaintiff was trained in Disaster Spiritual Care for the City of Chicago Department of Public Health, and in 2005 Plaintiff was certified by the American Red Cross to volunteer on its Spiritual Care Response Team. (*Id*. ¶ 81.) As part of the certification by the American Red

Cross, Plaintiff was trained by the U.S. Department of Public Health in Washington, D.C. (*Id*.) Plaintiff was deployed in approximately December 2005 to counsel workers and family members of victims during Hurricane Katrina in Louisiana, including members of different religious faiths. (*Id*.) Defendants were aware of these certifications and Plaintiff's deployment when conducting the 2010 background investigation discussed below. (*Id*.)

For approximately five years ending in 2001, Plaintiff was employed with the Holy Land Foundation for Relief and Development ("HLF") as the sole employee in its Illinois office. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 11.) During the course of his employment, Plaintiff raised funds for HLF. (*Id*. ¶ 12.) Plaintiff advised the ISP during the background investigation that he did not participate in determining how the money he raised for HLF would be distributed and Defendants never obtained any facts indicating that Plaintiff knew the funds he raised were sent to Hamas. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 111.)

In 2001, the federal government froze HLF's assets, shut down its operations, and raided its offices. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 13.) On December 4, 2011, HLF was designated as a Specially Designated Terrorist by the Treasury Department's office of Foreign Assets Control. (*Id*. ¶ 14.) HLF and several of its officers were subsequently convicted on federal criminal charges related to funding terrorist groups, including Hamas, in the Northern District of Texas. (*Id*. ¶ 15.) In January 1995, Hamas was designated by the President of the United States as a Specially Designated Terrorist pursuant to executive order. (*Id*. ¶ 16.) Plaintiff was named as an unindicted co-conspirator in the Texas HLF trial, along with 246 other individuals and organizations. (*Id*. ¶ 17; Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 104.) According to Plaintiff, "every single national Muslim imam figure" was included on the unindicted co-conspirator list, which was ultimately sealed by the court. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 105.)

Plaintiff has stated that when he worked for HLF, he believed it was a humanitarian organization and did not know that HLF financed Hamas. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 18.) Plaintiff learned about the ISP's volunteer chaplain program from Nick Hasan, who was a Sergeant with the ISP and former president of the Arab American Police Association. (*Id*. ¶ 19.)

In April 2008, Plaintiff submitted application materials requesting to serve as a chaplain with the ISP, including a resume that omitted his former employment with HLF. (*Id*. ¶ 20.) The ISP Chaplain Policy requires that all applicants pass a background check. (*Id*. ¶ 21.) Sergeant Hasan recommended Plaintiff for the chaplain position and several ISP chaplains interviewed Plaintiff. (*Id*. ¶ 26.) During the interviews, Plaintiff disclosed his race, religion, and country of origin, Lebanon, his employment with the Mosque Foundation and his association with other Islamic groups. (*Id*.) On December 1, 2009, Plaintiff received a letter from Keen stating that he had been selected as a volunteer chaplain. (*Id*. ¶ 27.)

On January 5, 2010, an article was published by Steven Emerson of IPT News titled "Radical Fundraiser Becomes Illinois State Police Chaplain," which criticized the ISP for

selecting Plaintiff as a chaplain because of his ties to HLF, including his being named as an unindicted co-conspirator at the HLF trial in Texas.  (*Id*. ¶ 35.)  The ISP was not previously aware of Plaintiff's former employment with HLF until Emerson's article was forwarded to ISP First Deputy Director Luis Tigera on January 6, 2010 by retired ISP Officer Donald Norton.  (*Id*. ¶ 36.)  Council on American-Islamic Relations-Chicago's Executive Director provided a letter of support for Plaintiff to Defendant Keen on January 21, 2010, which explicitly advised the ISP of Emerson's reputation as being an anti-Muslim polemicist.  (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 92.)

Upon being made aware of the article, the ISP began an inquiry to determine whether proper background checks had been completed on the 2009 chaplain class.  (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 38.)  The ISP determined that while a preliminary background check was performed on Plaintiff, no "supplemental" check was completed prior to Plaintiff being interviewed and selected in 2009.  (*Id*. ¶ 40.)  Subsequently, the ISP determined that, moving forward, chaplain applicants would need to pass a Category A background check, which includes verification of references and employment, credit, criminal, traffic and vital history checks, neighborhood canvassing and candidate interviews.  (*Id*. ¶¶ 41, 42.)  In January 2010, the ISP decided that Category A background checks would be completed on all seven chaplains who attended the December 2009 orientation, including Plaintiff.  (*Id.* ¶ 43.)  The ISP contacted all seven chaplains and instructed them to refrain from introducing themselves as ISP chaplains, advised them that a further background check would be necessary and requested that they complete additional background check forms.  (*Id*. ¶ 44.)

On February 14, 2010, Plaintiff completed the requested background check form which disclosed his prior employment with HLF.  (*Id*. ¶ 45.)  In the course of Plaintiff's background check, the ISP's Division of Internal Investigations ("DII") conducted various interviews and contacted the FBI, which provided information concerning Plaintiff, including a memo concerning his activity with HLF and DVDs that had been seized from the HLF office where Plaintiff worked.  (*Id*. ¶ 47.)  Monken and Keen also contacted the FBI concerning Plaintiff and Special Agent in Charge, Robert Grant, indicated that Plaintiff would not be selected as an FBI chaplain because he could not pass the background check.  (*Id*. ¶ 48.)  ISP officials, including Monken and Keen, viewed a clip of one of the videos seized from the HLF office where Plaintiff worked.  (*Id.* ¶ 50.)  The video depicted a musical performance for the Islamic Association for Palestine in which Plaintiff and others sang in Arabic, with translations in the form of subtitles.  (*Id*. ¶ 51.)  The lyrics of the song depicted in the video include "O, Hamas, teach us the rifle," and "O, Hamas, raise the banner of jihad."  (*Id*. ¶ 52.)  Also in the video, a small child dances with an object resembling a gun while others in the group cheer him on.  (*Id*. ¶ 53.)  The gun is then passed to a man in a white robe, who begins to dance with the gun and passes it to other men.  (*Id*. ¶ 53.)  During the dancing, another individual is present wearing a mask. (*Id*. ¶ 54.)

Plaintiff testified at his deposition that in praising Hamas in the video, he was referring to the Palestinian people, that Hamas means "excitement" in Arabic and the use of the word "jihad" in the song related to the struggle of the Palestinian people for freedom and equality.  (*Id*. ¶ 55; Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 109.)  Plaintiff acknowledged that others might

interpret the invocation of "Hamas" as referring to the terrorist organization. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 55.) Plaintiff also acknowledged that while the covering worn in the video is a cultural attribute of part of the Palestinian people living in the desert, such coverings "later on" became a symbol for Hamas, the terrorist organization. (*Id*. ¶ 56.) When questioned during the background investigation regarding the video, Plaintiff advised the ISP that he condemns Hamas and any suicide bombings, and instead he teaches against terrorism. Plaintiff stated that the song was a cultural song about the occupation of Palestine and not about the Jewish religion. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 106.) Defendants never obtained any information which refuted Plaintiff's explanation that the song in the video was a cultural song about the occupation of Palestine. (*Id*.) During his deposition, after explaining that he came to the United States from a country torn by civil war in which holding rifles was part of the culture, Plaintiff responded to defense counsel's characterization of the video as violent by stating: "People can interpret it any way they want but ignorance is my enemy. I have the right to explain to people what that mean [sic], and I will not be vulnerable to an interpretation that will stamp me with something I do not represent. So explaining to them that that is part of the culture of what people do hopefully will erase that interpretation." (*Id*. ¶ 109.) Plaintiff testified he was approximately 19 years old when he appeared in the video and was not yet employed at HLF. (*Id*. ¶ 110.)

In March 2010, after watching an ABC Chicago News special linking Plaintiff to terrorist activities, Sgt. Hasan, who initially told Plaintiff about the ISP volunteer chaplain program, advised his superiors of his relationship to Plaintiff. (*Id*. ¶ 98.) When Plaintiff subsequently asked Sgt. Hasan to attend a meeting with the Governor's office to discuss the allegations, Sgt. Hasan informed Plaintiff that he should resign as ISP Chaplain and "work on clearing his name with the Federal Government." (*Id*.)

Plaintiff denies that he ever financially supported the terrorist organization Hamas. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 58.) Upon completing their background investigation, the DII provided Keen with the file it had created, which included reports concerning neighborhood canvassing, information provided by the FBI, interviews with representatives of the Anti-Defamation League, reference checks and letters of recommendation. (*Id*. ¶¶ 60-61.) During its background investigation, the ISP was also provided the following information regarding Plaintiff: (1) at least one individual observed Plaintiff remain very calm during forums held regarding Israel's bombings of the Gaza Strip and never saw Plaintiff promote violence; (2) Plaintiff has attended roundtable events between the Mosque Foundation and the FBI on a regular basis since 2004, which include discussions regarding law enforcement concerns affecting the Muslim community; (3) FBI Special Agent Ross Rice stated that the Mosque Foundation had done a "180-degree" turn around in the past ten years when interacting with law enforcement; and (4) in May 2010, the FBI accepted Plaintiff into its Citizen's Academy, which creates a rapport between the FBI and community leaders, involves discussion of future criminal trends, and culminates in a tour of the FBI Academy in Quantico, Virginia. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶¶ 99-101.)

Plaintiff's background file also included a "Confidential Report" from DII Special Agent

Michael Lort which stated in part:

> During the course of this Background investigation, I received information which links the applicant with organizations which have been identified by the United States Government as supporting terrorism. However, upon concluding the investigation I was unable to corroborate the applicant was aware of the illegal actions being committed by these organizations. Based on my understanding of the department's expectations pertaining to Background Investigations, it is my opinion the applicant should not be considered suitable for the Chaplain position. My opinion is based on the seriousness of the allegations and the lack of evidence to disprove the accuracy of the allegations.

(Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 62.) Lort described his standard for determining a candidate's suitability as being based on "a vari[ety] of things," including criminal background, credit history, and the candidate's truthfulness. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 84.) Lort viewed an arrest without conviction as a possible factor affecting suitability, depending on the nature of the arrest and how long ago the arrest occurred, but DII did not have any guidelines regarding this issue. (*Id.*)

During the period that Plaintiff underwent the background investigations for the chaplain position, the ISP did not have any standards or guidelines in place for obtaining information with respect to an applicant's membership in political organizations. (*Id.* ¶ 85.) The ISP also had no standard in place requiring an unindicted co-conspirator to be barred from employment, and such an issue would be decided on a case-by-case basis. (*Id.*)

In June 2010, ISP officials recommended that Plaintiff not be retained based on their assessment of his background investigation. (Pl.'s LR 56.1(b)(3)(B) Resp., Dkt. # 124, ¶ 63.) Monken ultimately made the decision to adopt the unanimous recommendation of the group and terminate Plaintiff's appointment. (*Id.* ¶ 64.) The six other chaplain applicants were retained in the ISP chaplain program upon successfully passing the Category A background checks in 2010. (*Id.* ¶ 71.) Following Plaintiff's termination as a volunteer chaplain, the ISP continued searching for a volunteer Muslim chaplain. (*Id.* ¶ 78.) However, no other Muslim faith leader applied to be a candidate for the position, and the only responses the ISP received in response to requests for additional candidates made to Muslim organizations throughout Illinois were recommendations in support of Plaintiff. (Defs.' LR 56.1(b)(3)(C) Resp., Dkt. # 133, ¶ 88.)

## II. Summary Judgment Standard

A party may move for summary judgment on a claim or defense and the motion shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine dispute of material fact exists when there is "sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Id.* at 255. It is not for the court at summary judgment to weigh evidence or determine the credibility of a witness' testimony. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 623, 630 (7th Cir. 2011).

### III. Analysis

    A    <u>§ 1983 First Amendment</u> (against Monken and Keen individually and in their official capacities)[1]

Plaintiff claims he was dismissed as the first Muslim volunteer chaplain with the ISP based on (*i.e.*, in retaliation for) his associations and activity protected by the First Amendment. As noted by the Seventh Circuit:

> A First Amendment retaliation claim involves a three-step analysis: First, we must determine whether the employee's speech was constitutionally protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech.

*Chaklos v. Stevens*, 560 F.3d 705, 711 (7th Cir. 2009) (internal quotation marks and citation omitted). The Seventh Circuit has stated that the First Amendment prohibits a governmental entity from denying a benefit to a volunteer based on his protected activity. *Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 534-35 (7th Cir. 2006). Thus, any references to an "employee" in the following analysis include Plaintiff.

"The First Amendment protects a public employee's right to speak as a citizen about matters of public concern under certain circumstances." *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 508 (7th Cir. 2007). "Under the *Connick-Pickering* test, a public employee can establish that his speech is constitutionally protected if (1) the employee spoke as a citizen on matters of public concern, and (2) the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees." *Id.* at 509.

Defendants concede for purposes of this motion that Plaintiff's speech involves issues of

---

[1] The Court notes that any suit for damages against Monken and Keen in their official capacities is barred. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' [subject to an action for damages] under § 1983").

public concern and move directly to the balancing of interests.[2]

Defendants assert that under the *Pickering* balancing test, so-named for the Supreme Court case that identified the competing concerns, *Pickering v. Bd. of Educ. of Tp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 574 (1968), Plaintiff's interest in the expression, whether or not it addresses a matter of public concern, is outweighed by Defendants' interest in promoting effective public service. In balancing the interests, the Court is to consider several factors, including:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Chaklos*, 560 F.3d at 715-16.

"With respect to the first two factors, we note that a government employer is allowed to consider 'the potential disruptiveness' of the employee's speech." *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999). Here, Defendants assert that they reasonably believed that condoning Plaintiff's expression would jeopardize the integrity of the ISP. When asked why, after reviewing the supplemental background check report, he had recommended to Monken that the ISP not retain Plaintiff as a volunteer chaplain, Keen testified that:

> A: My recommendation was based on really no one thing. It was the totality of the circumstances. First of all, . . . the position is a voluntary position . .

---

[2] But, what if the employee was not an employee when he spoke or, here, acted? Neither Defendants nor Plaintiff address whether an employee's *past* actions or affiliations, which were made when the employee was not an employee but are the basis for a *current* personnel decision, are protected. *See, e.g., Grabiak v. Pa. State Police*, 276 Fed. Appx. 210, 214 (3d Cir. 2008) (rejecting plaintiff's claim that prior employment as a police officer was expressive association and stating that "[plaintiff] has provided no authority that the First Amendment precludes a current employer from considering prior employment in deciding whether to retain an at-will employee"). Moreover, *"Garcetti* [*v. Ceballos*, 547 U.S. 410 (2006)], requires courts to first decide whether a plaintiff was speaking 'as a citizen' or as part of her public job, before asking whether the subject-matter of particular speech is a topic of public concern." *Houskins v. Sheahan*, 549 F.3d 480, 488 (7th Cir. 2008). The parties do not address this aspect of the appropriate analysis, likely due in part to the fact that Plaintiff was not an employee when he engaged in the relevant activity. Because the parties do not address either of these issues, neither does the Court.

> . [and] Chaplains are subject to removal at any time for really any cause. All the Chaplains have signed a document stating that they're aware of that, including [Plaintiff]. . . . I felt very strongly about . . . protect[ing] the integrity of the [ISP]. . . . [Plaintiff] was the unindicted co-conspirator, I read the FBI case, I read the, all the transcripts from the audio and the videotapes that were seized [from the HLF offices]. . . [including] from one of the conferences that [Plaintiff] spoke at. There was another speaker [at the conference] who went on about talking about . . . the Jews and how we should do this to the Jews and their leader Clinton . . . . The speaker also mentioned the 1982 Beirut bombing of the Marine Corps barracks. . .
> . . . .
> The videotapes themselves were, we saw this particular candidate, you know, up on the stage singing about Jihad and martyrdom and . . . with children in view of the camera and they're passing around the rifle and dancing and kind of celebrating the rifle and appearing to celebrate . . . Jihad and martrydom. . . .
> . . . .
> . . . The FBI admitting that, without going into detail, but this candidate wouldn't pass their background check for a, for one of their Chaplain positions.

(Defs.' Ex. S, Keen Dep., at 119:3-120:24.)

Further, Defendant Monken attested as follows: "I considered a video of a disturbing musical performance by Plaintiff in rendering my decision not to retain him as a chaplain. After viewing the video, I was concern[ed] that Plaintiff would not make an appropriate interfaith chaplain, that his retention as a chaplain would be detrimental to Illinois State Police's reputation, and that [Plaintiff] genuinely supported Hamas." (Defs.' Ex. V, Monken Decl., ¶ 2.) Monken also stated that "[i]f the allegations about Plaintiff's alleged terrorist ties had been proved false, I would have determined he had passed his background check and recommended that he be retained as a chaplain." (*Id*. ¶ 3.) In his deposition, Monken testified that the "level of access" to information at the ISP Plaintiff would have had as a volunteer chaplain included:

> [I]nteract[ing] regularly with sworn officers and civilian employees. They do ride-a-longs and things like that, so they do have some visibility on what's actually happening on the ground. They do have a level of access to facilities throughout the departments, so they have a general level of access.

(Defs.' Ex. T, Monken Dep., at 102:5-10.) When asked if "one of your concerns in not retaining Mr. Mustapha [was] the fact that . . . he would have [the] access that you just described," Monken replied "Yes." (*Id.* at 102:11-15.)

Plaintiff argues that the ISP's concern regarding its integrity is ill-placed because it does not consider "the equally viable alternative of retaining Plaintiff and issuing a public statement

8

explaining the requirements of the First Amendment, thereby distancing the ISP from any endorsement of Plaintiff's activities." (Pl.'s Resp., Dkt. # 123, at 10.) But this statement ignores that "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Kokkinis,* 185 F.3d at 845. "Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." *Id.* (citation and internal quotation marks omitted).

The ISP's concerns regarding its integrity and the potential disruptive nature of hiring Plaintiff were well-founded given the earlier blog entry posted soon after Plaintiff went through chaplain orientation criticizing the ISP for selecting Plaintiff given his purported ties to terrorism. *See Williams v. Seniff*, 342 F.3d 774, 784 (7th Cir. 2003) (in concluding that police department's interests outweighed individual police officers' First Amendment rights, noting that the plaintiff's "conduct resulted in a number of phone calls to Sheriff Seniff . . . demonstrating the displeasure of various individuals with Mr. Williams' public statement"). Moreover, due to the the ISP's information-sharing agreements with other law enforcement agencies, its concern regarding the impact of hiring Plaintiff on its reputation and thus, on those information-sharing relationships, is valid. *Id.* (noting that police officer's comment "created significant unrest in the law enforcement community" in finding that police department's interests outweighed police officer's).

Plaintiff denies any cooperation or participation in any terrorist activities and states that he firmly opposes terrorism of any kind. In coming to its conclusion, the Court does not make a specific finding to the contrary. It is clear, however, that the ISP was within its bounds as a law enforcement agency to terminate Plaintiff as a volunteer chaplain considering his admitted appearance in a video in which individuals, including one masked man, are passing around a rifle and chanting about jihad, his being named as an unindicted co-conspirator in a federal terrorism trial in Texas, his position as a fundraiser for HLF, which has since been named a Specially Designated Terrorist by the United States Treasury's Office of Foreign Assets Control, and the FBI's statement that he would not pass a background check to be a volunteer chaplain with the FBI. Even assuming the truth of Plaintiff's explanations for all of these points, the ISP's decision is given "considerable judicial deference." *Kokkinis*, 185 F.3d at 846 (citations and internal quotation marks omitted). Thus, the Court finds Plaintiff's First Amendment interests are outweighed by the ISP's considerations regarding the potential disruption to its goals and mission as a law enforcement agency, including its desire to maintain both a strong relationship with other law enforcement agencies as well as a high level of public confidence, and its need to avoid unnecessary internal dissension.

Because the Court has concluded that Plaintiff's First Amendment rights were not violated, the Court need not address the other reasons provided by the ISP for its decision or the qualified immunity argument.

B.  Title VII (against the Illinois State Police)

With respect to the Title VII race, religion and national origin discrimination claim, Plaintiff may prove discrimination under either the direct or indirect method. *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). Under the direct method, a plaintiff must produce either direct or circumstantial evidence of discrimination. *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). Direct evidence usually "requires an admission of discriminatory animus," while circumstantial evidence "establishes an employer's discriminatory motive through a longer chain of inferences." *Id*. According to the Seventh Circuit,

> [c]ircumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008) (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)).

While Plaintiff contends that sufficient circumstantial evidence exists from which a jury could conclude that the ISP dismissed Plaintiff based on his status as an Arab Muslim, Plaintiff's circumstantial evidence of discrimination is unpersuasive. First, he states that "[a]bsent any of the issues regarding Plaintiff's work with HLF or [the Islamic Association for Palestine], Defendants were fully apprised that Plaintiff was the best person out of any imam in Illinois to be the first Muslim ISP Chaplain," and that "[w]hen faced with allegations characterizing Plaintiff as a 'radical fundraiser' and a security threat by an individual known to be Islamophobic, Defendants immediately tarnished Plaintiff's reputation, falsely portraying him as supporting terrorism." (Pl.'s Resp., Dkt. # 123, at 17.) Plaintiff goes on to assert that not only did the ISP rely on biased sources but also that the "ISP ultimately found no evidence to show that Plaintiff was aware of the illegal actions committed by the organizations in which he was involved." (*Id*. at 18.) Plaintiff notes that "those who know" Plaintiff told the ISP that he has been "one of the most influential Islamic leaders in Illinois," who teaches against terrorism, works to achieve peace, and assists law enforcement in addressing concerns with the Muslim community. (*Id*.)

But none of these statements points directly to discrimination of Plaintiff based on his race or national origin. *Atanus*, 520 F.3d at 670 (focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action") (internal quotation marks omitted). Indeed, it is undisputed that the ISP initially retained Plaintiff as a volunteer chaplain knowing his race, religion, country of origin and position in the Muslim community. It was only after finding out about Plaintiff's past conduct, *i.e.*, that he had been employed by HLF, was named as an

10

unindicted co-conspirator in a federal terrorism trial, appeared in a video in which individuals are toting guns and chanting "O, Hamas, teach us the rifle" and "O, Hamas, raise the banner of jihad," and learned that Plaintiff would not pass the background check to be a volunteer chaplain with the FBI that the ISP decided not to retain Plaintiff as a volunteer chaplain. Plaintiff has not referred to any circumstantial evidence which points directly to discrimination.

Nor does the same evidence establish pretext. Under the indirect method, a plaintiff can attempt to establish a prima facie case of discrimination by showing that: (1) he was a member of a protected class; (2) he was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a prima facie case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Id*.

"The prima facie case and pretext inquiries often overlap; [a court] may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman–Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). "Even if [an employer's] reason for [the employee's] discharge was foolish or trivial or even baseless," the reason is not pretextual if the employer honestly believes the reason for the employment decision at issue. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) (citation and internal quotation marks omitted). Plaintiff simply points to no record evidence establishing that Defendant's reasons for not retaining him as a volunteer chaplain are pretextual.

Therefore, the Court grants the ISP's motion for summary judgment as to the Title VII claim.

C.  Equal Protection Claim (against Monken and Keen individually and in their official capacities)

Because the same standards for proving intentional discrimination apply to claims under Title VII and the equal protection clause, *Radentz v. Marion Cnty.*, 640 F.3d 754, 757 (7th Cir. 2011), the Court grants Monken and Keen's motion for summary judgment on the equal protection claim.

**Conclusion**

      For the reasons stated below, Defendants' motion for summary judgment [110-1] is granted. Civil case terminated.

**Date**: June 25, 2013

                                                  **Ronald A. Guzmán**
                                                  **United States District Judge**